# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 20, 2013 Session

## STATE OF TENNESSEE v. JAMAAL L. BYRD

### Appeal from the Criminal Court for Hamilton County
### No. 276182    Rebecca J. Stern, Judge

---

### No. E2013-00365-CCA-R3-CD - Filed February 10, 2014

---

The defendant, Jamaal L. Byrd, appeals from his Hamilton County Criminal Court jury conviction of voluntary manslaughter, claiming error in the jury instructions provided by the trial court and in the trial court's failure to admit certain evidence. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

Ryan David Hanzelik (on appeal and at trial) and Fred Hanzelik (at trial), East Ridge, Tennessee, for the appellant, Jamaal L. Byrd.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; William H. Cox, III, District Attorney General; and Brian Finley and Matthew Rogers, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The conviction in this case relates to the defendant's shooting the victim, Terrance Etchison, in the parking lot of the Kanku market ("the Kanku") in Chattanooga on February 27, 2010. The proof adduced at trial established that the defendant and the victim had a verbal exchange inside the market and that after the men walked outside, the defendant went to his car, got a gun, and shot the victim one time. The victim was unarmed. The defendant did not deny shooting the victim but claimed that he did so in self-defense.

Carmen Fazio, the manager of the Kanku, testified that he saw the defendant

and the victim speaking to each other inside the store. He said that neither man appeared angry, but he heard the victim say the word "Frankenstein." Shortly after the two men left the store, Mr. Fazio heard gunshots and then saw the victim lying in the parking lot. Mr. Fazio telephoned 9-1-1 and then went to the parking lot to check on the victim. The victim died shortly thereafter.

Eric Evans testified that he observed the defendant and the victim talking with each other inside the Kanku on February 27, 2010. He said that he "couldn't make it out clearly what they were saying" and that the two men did not seem upset. Mr. Evans testified that he had known the victim since he "was about 13 or something" and that they were friendly but not close friends. Mr. Evans recalled that while in the parking lot, he overheard the victim ask the defendant if the defendant was "going to get a gun for him." He said that the victim, who appeared to be unarmed, did "not really" seem upset, but "he didn't seem to be in a good mood either." Mr. Evans recalled the defendant's asking the victim "did he want it" before shooting the victim. Mr. Evans confirmed that he did not see the victim with a weapon and did not see the victim do anything threatening. Mr. Evans immediately got into his car and drove away after the shooting.

Spencer McPherson testified that he went to the Kanku with the victim on February 27, 2010. Mr. McPherson said that the victim went into the store, and when he came back out, he and the defendant exchanged words. Mr. McPherson said that he could not understand all the men were saying, but he heard the victim say to the defendant, "I hope you're not trying to go get a gun." Mr. McPherson insisted that the victim was unarmed and denied taking anything from the victim's hand after his death.

Charvez Harris testified that he, too, traveled to the Kanku with the victim on the night of the shooting. Mr. Harris said that he went into the store with the victim and that the victim purchased some Skittles. Mr. Harris then went back to the car, where he started to open his own bag of Skittles. He said that before he could open the bag, he heard the gunshot and saw the victim fall to the ground. Mr. Harris testified that he became "hysterical" after the shooting, running around the parking lot and eventually punching a nearby dumpster. Mr. Harris said that during his hysterical running around, he heard the victim's cellular telephone ringing, so he took it from the victim's pocket and answered it. He denied taking any weapon from the victim's pocket or hand and maintained that the victim was unarmed.

Ryan Lawrence testified that he traveled to the Kanku with the victim and Messrs. McPherson and Harris. Mr. Lawrence said that after the men made their purchases, the victim asked Mr. Lawrence to take a pack of Skittles for safekeeping, and then Mr. Lawrence went back to the victim's car. Mr. Lawrence said that he asked Mr. Harris, who

had purchased his own pack of Skittles, if he could have some of Mr. Harris's Skittles. At that point, Mr. Lawrence heard a gunshot, and Mr. Harris said, "[O]h my God, they just shot T brother." Mr. Lawrence said that Mr. Harris pushed him out of the car, and they walked toward the victim. Mr. Lawrence testified that the victim had been shot in the neck, and Mr. Harris "was going crazy. He done punched the dumpster, almost broke his hand, and crying on me." Mr. Lawrence recalled that the victim's phone kept ringing, so Mr. Harris "went in his pocket and got his phone and it was like his old lady or somebody was calling." At some point, Mr. Harris vomited. Mr. Lawrence testified that the victim did not have anything in his hand at the time he was shot and that he had not seen the victim in possession of a weapon at any point that evening.

Chattanooga Police Department Sergeant Brian Russell, a member of the crime scene unit, testified that he photographed and collected what initially appeared to be a plastic "bag of dope" on the ground "by the victim's head." He said that once he collected it, he realized that the bag was empty and that the manner in which it had been twisted made it look like a bag of drugs. He also observed a blood-stained bag of Skittles "close to the victim." Police officers searched the victim's car and did not "find any illegal drugs, . . . ammunition, guns, bullets, anything in there." They also searched the trash can near the victim. The trash can contained only "normal trash people throw out of their cars," and "it wasn't that full."

Chattanooga Police Department Investigator Jay Montgomery testified that when he arrived on the scene, Messrs. Lawrence, McPherson, and Harris had been separated and detained. After obtaining preliminary information from those three men, Investigator Montgomery watched the surveillance video from the store. He distributed a still-frame photograph taken from the store's video surveillance camera to area media. He testified that he learned the defendant's identity from tips called in after the request for assistance. Investigator Montgomery then created a photographic lineup that contained the defendant's photograph and showed it to the witnesses who had been at the scene. All the witnesses identified the defendant as the shooter. Based on this information, he obtained a warrant for the defendant's arrest.

Ronald Lebron Madden testified that he went to the Kanku on February 27, 2010, to purchase gasoline. Mr. Madden said that as he pulled up to the pump, his "spirit just told [him] to be still." He recalled that as he was "being still," he saw "one black male come from Kanku and . . . another black male approaching." He described what happened next,

> And then I'm seeing one black male go like, well you going to
> do whatever you want to. The next thing I know I'm seeing a
> gun pulled, boom. And I'm seeing one guy laying down on the
> ground, which I can't believe this. I just can't believe this is

happening in front of me. So the defendant then gets, like he don't give a shit, he just gets back into his car, pulls right back in front of me like he don't care, and just pulls right off. I was even scared to get out.

Mr. Madden said that he provided a description of the defendant's car when he telephoned 9-1-1 and that he later identified the defendant as the shooter from a photographic lineup. Mr. Madden testified that the victim "didn't even have an ink pen in his hand, less alone a gun, a weapon, a knife. . . . Other than him throwing his hands up . . . that's the only thing I seen. And when I seen his hands up like this, it's nothing in his hands." He said that the defendant drove off at "a normal speed like he hadn't done nothing. Like he hadn't did nothing wrong."

Doctor James Metcalfe testified that he performed the autopsy of the victim on March 4, 2010, and determined the cause of death to be a gunshot wound. He said that the victim suffered "a gunshot wound in the center of the upper chest just to the left of the midline." The bullet entered the body "through the second rib cartilage" and then damaged the pulmonary artery, the aorta, the trachea, the "broncus" to the left lung, and the esophagus before going through the right half of the spinal chord, cutting the cord in half. The bullet finally lodged in the muscles of the victim's back. The victim had alcohol but no drugs in his system at the time of his death.

Following this testimony, the State rested. After a full *Momon* colloquy, the defendant elected not to testify but chose to present the testimony of Edward McCallum.

Mr. McCallum testified that he went to the Kanku on the date of the offense to buy a pack of cigarettes. At some point while inside the store he heard the victim say, "I'll kill you mother f*****." In the parking lot, he heard the victim convey a similar threat. Mr. McCallum said that he left immediately after hearing the gunshot and that he did not contact authorities despite hearing the plea for tips on the news, explaining that he "didn't want to get involved and be a part of any of this."

Based on this proof, the jury convicted the defendant, originally charged with first degree murder, of the lesser included offense of voluntary manslaughter. Following a sentencing hearing, the trial court imposed a sentence of four years to be served as 11 months and 29 days of incarceration followed by probation.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by altering his requested jury instruction on self-defense, by refusing to provide jury instructions

on the defenses of duress and necessity, and by refusing to admit evidence of the victim's gang affiliation. We consider each claim in turn.

## I. Jury Instructions

The defendant contends that the trial court erred by altering the language of his requested instruction on self-defense in a manner that lessened the State's burden of proof and that the trial court erred by refusing his requested instructions on the general defenses of duress and necessity. The State asserts that the defendant waived our consideration of his self-defense instruction claim by failing to raise this issue in his motion for new trial, by failing to include the specially requested instruction in the record on appeal, and by failing to include a transcript of the hearing on the motion for new trial in the record on appeal. The State contends that the defendant waived consideration of the trial court's refusal to instruct on duress and necessity by failing to include the transcript of the hearing on the motion for new trial in the record on appeal. In the alternative, the State contends that the jury instructions provided by the trial court were appropriate.

### A. Self-Defense

The defendant asserts that he "specifically objected to the trial [c]ourt for removing the negation language in the Requested Charge furnished by the" defendant. As the State correctly points out, the "Requested Charge" was not included in the record on appeal, discussions regarding its use were conducted off the record in the chambers of the trial judge, and the issue was not preserved in the defendant's motion for new trial. Any of these three circumstances would result in a waiver of the issue on appeal.

The defendant moved this court to order the trial court clerk to supplement the record with the "Requested Charge," and the trial court clerk responded, via letter, that the defendant's alleged motions requesting special jury instructions could not be located anywhere within the trial court record. The clerk noted that the defendant's counsel claimed that the request was filed on July 10, 2012, and that "it appears that the attorney retained the originals." The clerk stated that the defendant's counsel "delivered these motions" to the trial court clerk on November 18, 2013, more than 16 months after the conclusion of the defendant's trial. Because we cannot verify that the request filed with the trial court clerk on November 18, 2013, was actually considered by the trial court prior to the conclusion of the trial, we cannot consider the defendant's claim relative to it.

To compound the waiver, all discussion relative to the requested self-defense instruction occurred off the record within the chambers of the trial judge. As such, we are without the trial court's actual ruling on its use. "[T]his Court has repeatedly discouraged

'off-the-record' discussions concerning matters of significance in criminal proceedings because such discussions may preclude appropriate appellate review." *State v. Thomas Carter*, No. E2005-00731-CCA-R3-CD, slip op. at 5-6 (citing T.C.A. § 40-14-307(a) (requiring court reporter to 'attend every stage of each criminal case'); *State v. Hammons*, 737 S.W.2d 549, 551 (Tenn. Crim. App. 1987) (condemning 'off-the-record bench conferences'); *State v. Barnes*, No. M2001-00631-CCA-R3-CD (Tenn. Crim App., Nashville, June 24, 2002) (discouraging 'off-the-record' discussions); *State v. James Hall Schlegel*, No. W2000-02597-CCA-R3-CD (Tenn. Crim. App., Jackson, Jan. 28, 2002) (condemning in-chambers charge conferences); *State v. Blaine M. Wright*, No. 03C01-9410-CR-00388 (Tenn. Crim. App., Knoxville, Dec. 11, 1995) (noting the requirement to preserve for the record all bench conferences)). Although the defendant's objection to the charge eventually provided by the trial court followed by a brief discussion appears in the transcript, that discussion relies heavily on the earlier in-chambers discussion, with both parties and the trial court referencing it. As a result, that excerpt is not particularly helpful to our review.

The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Because the defendant failed to include the original requested charge in the record on appeal, and indeed failed to prove that he ever actually filed it in the trial court, and because he failed to have the trial court's ruling on his request memorialized in the trial record, we must presume that the ruling of the trial court relative to his request was correct.

The defendant also waived this issue by failing to include it in his motion for new trial, *see* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in the motion); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989), and any attempt at plain error review is rendered impossible by the defendant's failure to prepare an adequate record on appeal.

Finally, and perhaps most importantly, the self-defense instruction provided by the trial court tracked the language of the pattern jury instruction and was a correct

statement of the law.

## *B. Duress*

The defendant also contends that the trial court committed plain error by refusing to instruct the jury on the general defense of duress. Again, the State asserts that the defendant waived our consideration of this issue by failing to include a transcript of the hearing on the motion for new trial in the record on appeal. In the alternative, the State contends that the defense of duress was not fairly raised by the proof.

Although the defendant failed to include in the appellate record the transcript of the hearing on the motion for new trial, that failure alone may not have resulted in a waiver of the issue in this case. Unfortunately for the defendant, however, the record establishes that the primary discussion regarding the requested jury instructions occurred off the record in the chambers of the trial judge. The only recorded reference to the duress instruction came just before closing arguments, when the trial court noted only briefly that the defendant had requested the instruction and that the court was of the opinion that it had not been fairly raised by the proof. Neither the requested instruction or the parties' argument on the instruction was included in the record. In our view, the omission of the new trial hearing transcript coupled with the off-the-record discussion of the jury charge results in the waiver of this issue.

The defendant asks this court to review the issue for plain error. Before an error may be recognized as plain, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Olano*, 507 U.S. 725, 732 (1993) (citations omitted).

In *State v. Smith*, our supreme court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

> "(a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283.

The defendant's bid for plain error review fails upon examination of the first *Adkisson* factor; namely, the record does not clearly establish what happened in the trial court. As indicated, the discussion of the jury instructions occurred off the record. Although the trial court made a brief reference to its refusal to provide the duress instruction, without a transcript of the initial discussion regarding that charge, we cannot fully evaluate the defendant's position or the trial court's ruling. Even were we to conclude, however, that the record clearly established what occurred in the trial court, the defendant still could not prevail because he did not demonstrate that a clear and unequivocal rule of law was breached. Code section 39-11-504 provides,

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.
>
> (b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

T.C.A. § 39-11-504. "This rare defense is present when a defendant commits an offense because another person threatens death or serious injury if the offense is not committed." *Id.*,

Advisory Comm'n Comments. No proof existed to suggest that any person threatened the defendant with death or serious bodily injury should he refuse to murder the victim. Consequently, the trial court did not err by denying his request for an instruction on duress. *See id.* § 39-11-203(c) ("The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof."); *see also State v. Hatcher*, 310 S.W.3d 788, 817 (Tenn. 2010).

### C. Necessity

The defendant also asserts that the trial court erred by denying his request for an instruction on the general defense of necessity. Again, the defendant has waived plenary review of this issue by failing to include the transcript of the hearing on the motion for new trial in the record on appeal and by failing to ensure that the parties' discussion of the jury instructions and the trial court's ruling on the instructions was included in the trial transcript. Moreover, he has failed to establish that the trial court committed plain error by refusing to instruct the jury on the general defense of necessity because the record does not clearly establish what happened in the trial court or that an unequivocal rule of law was breached. Code section 39-11-609 provides,

> Except as provided in §§ 39-11-611 -- 39-11-616, 39-11-620 and 39-11-621, conduct is justified, if:
>
> (1) The person reasonably believes the conduct is immediately necessary to avoid imminent harm; and
>
> (2) The desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

T.C.A. § 39-11-609. The defense of necessity "excuses criminal liability in those exceedingly rare situations where criminal activity is an objectively reasonable response to an extreme situation." *Id.*, Advisory Comm'n Comments. Absolutely no evidence suggested that the defendant's murdering the victim was the "objectively reasonable response to an extreme situation."

### II. Deceased's Alleged Gang Affiliation

The defendant next contends that the trial court erred by prohibiting any questions regarding the victim's alleged gang affiliation. The defendant avers that the trial

court should have permitted him to question Mr. McPherson, Mr. Lawrence, and Investigator Montgomery about the victim's gang membership and participation in gang-related criminal activity before the murder. The State asserts that the defendant waived our consideration of the trial court's rulings regarding the question of Messrs. McPherson and Lawrence by failing to make an offer of proof. The State argues that the trial court properly excluded Investigator Montgomery's response to a question about the victim's gang affiliation because the question called for inadmissible hearsay.

During cross-examination of Mr. McPherson, defense counsel asked, "Were you aware that your stepfather, you called him, had been in a gang?" The State objected, noting that counsel had "been warned not to be on this." The trial court sustained the objection, and defense counsel indicated a desire to recall the witness at a later point. The defendant did not make an offer of proof and did not recall the witness. In consequence, he failed to preserve the objection for appellate review. *See* Tenn. R. Evid. 103(a)(2) ("In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context."); *see also State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997) ("Not only does [an offer of proof] ensure effective and meaningful appellate review, it provides the trial court with the necessary information before an evidentiary ruling is made. Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded.").

Later, during cross-examination of Mr. Lawrence, defense counsel asked, "Is [Seneca Harris] a member of the Crips gang?" The State objected, branding defense counsel's repeated attempts to inject testimony and evidence about gang activity into the trial as "absolutely ridiculous and unprofessional." The trial court sustained the objection, deeming the answer to the question irrelevant and admonished counsel to approach the bench before making any gang references. Again, the defendant did not make an offer of proof and, as a result, waived consideration of the issue.

Finally, during cross-examination of Investigator Montgomery, the State asked for a bench conference just after defense counsel asked if the investigator had interviewed Jacquelin McRoberts. During the bench conference, defense counsel stated,

> He was told by the baby-mother, she went to the officer in an interview and said, hey, he's a member of the Eight Tray G gang, which is a sect of the Crips. And he might be related – trying to help – might be related to gang activity. Because he'd been involved in criminal activity. But anyway, I understand the criminal activity part. . . .

-10-

The trial court interjected that the victim's alleged gang activity remained irrelevant because the defendant had failed to make a connection between the alleged activity and the defendant. The court explained that "general" information that the victim was "just a bad guy that does gang stuff" was inadmissible. The court agreed, however, that the defendant's testimony about his knowledge of the victim's gang affiliation might make the evidence relevant later in the trial. The defendant did not, however, make any further attempt to have the evidence admitted. Additionally, no proof suggested that the victim's alleged gang affiliation played any role in the defendant's decision to shoot the victim. In our view, even if defense counsel's recitation qualified as an offer of proof, the trial court correctly excluded the proffered testimony. Testimony by Investigatory Montgomery that the victim's baby's mother told him that the victim was a member of a gang would have been inadmissible hearsay. Tenn. R. Evid. 801(c), 802.

*Conclusion*

Based upon the foregoing, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-11-